UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____x

DONALD LUSK,

        Plaintiff,

     -against-                              04 Civ. 8633 (CM)(LMS)

VILLAGE OF COLD SPRING,

        Defendants.
_____x

DECISION AND ORDER GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR A PERMANENT INJUNCTION

McMahon, J:

      Plaintiff Donald Lusk commenced this action against defendant Village of Cold Spring for

violations of his First Amendment right to free speech. Plaintiff, who lives in the Historic District

of Cold Spring, was cited for violating several local ordinances after he displayed multiple signs

outside his home without first obtaining a permit. Contending that these and other laws

unconstitutionally restrict his freedom of speech, Plaintiff filed this action to enjoin Cold Spring

from enforcing these ordinances. The Court consolidated plaintiff's application for a preliminary

injunction with the request for permanent injunctive relief.

      For the reasons discussed below, plaintiff's motion for a permanent injunction against the

enforcement of certain provisions of the Cold Spring Village Code is granted in part and denied in

part.

**Facts**

Plaintiff is a resident of Cold Spring, New York. (Complaint ("Cplt.") ¶ 6.) He lives within both the B-1 General Business and Historic Districts. (Affidavit in Support of Application for Preliminary Injunction, dated October 27, 2004, ("Lusk Aff.") ¶ 2; Tompkins Complaint, Exhibit B to Defendant's Memorandum of Law in Opposition to Plaintiff's Application for a Preliminary Injunction, dated December 1, 2004, ("Defendant's Memo"), at 1.)

In June 2004, plaintiff posted signs on his property to protest a planned development on the Cold Spring waterfront. (Cplt. ¶ 7.) One sign, which he placed on his porch facing the street, read, "Go to public hearing to see plans for our waterfront." (Id.) The other sign, which leaned against his front porch, said, "Think that building is big." (Id.) He has posted a number of similar signs – all of which are non-commercial and political – on his porch and in front of his home on prior occasions. (Cplt. ¶¶ 8-9.)

Plaintiff further alleges that he intends to run for Mayor, and states that he plans to post signs throughout the Village in support of his candidacy. (Cplt. ¶ 28.)

On July 19, 2004, on account of the signs on his porch and on the ground in front of his home, plaintiff was served a Violation Notice by George C. Tompkins, the Building Inspector. (Cplt. ¶ 10.) He was charged with two counts of violating Village Code § 64-5(A), two counts of violating §134-9B, and two counts of violating §134-9G(1-b). (Cplt. ¶¶ 11-13.)

On August 2, 2004, the Building Inspector issued plaintiff an appearance ticket to appear in the Village of Cold Spring Justice Court on August 9, 2004, to answer the violations set forth in the July 19, 2004 Violation Notice. (Defendant's Memo, Exh. A.) Plaintiff appeared in Justice Court on January 10, 2005 and pled guilty to one count of posting signs without a permit, in

violation of § 134-9B. (Randazzo Supplemental Affidavit, dated February 15, 2005, ("Randazzo Supp. Aff."), Exh. B; Defendant's Memo, Exh. B, at 1.)

**Procedural History**

On November 1, 2004, plaintiff commenced this action. He originally sought an injunction against his pending criminal proceeding, but since I was unable to grant such relief, see <u>Younger v. Harris</u>, 401 U.S. 37, 53 91 S. Ct. 746, 27 L. Ed. 2d 669 (1971), the parties set a briefing schedule to allow for a more leisurely examination of the constitutional issues. All parties agree that summary judgment on the constitutionality of the ordinance is the appropriate manner of disposing of this case.

**Discussion**

**Standard for Granting a Permanent Injunction**

"The standard for obtaining a permanent injunction is essentially the same as for a preliminary injunction with the exception that the plaintiff must actually succeed on the merits of the case, rather than merely demonstrate that success is likely in a future proceeding." <u>Old Republic Ins. Co. v. Hansa World Cargo Serv.</u>, 170 F.R.D. 361, 385 (S.D.N.Y. 1997) (citations and internal quotation marks omitted). To obtain a preliminary injunction in the Second Circuit, a party must establish: "(1) irreparable harm, and (2) either (a) a likelihood of success on the merits, or (b) a balance of hardships tipping decidedly toward the party seeking the injunctive relief." <u>Covino v. Patrissi</u>, 967 F.2d 73, 77 (2d Cir. 1992); <u>see also</u> <u>Richard Feiner & Co., Inc. v. Turner Entertainment Co.</u>, 98 F.3d 33, 34 (2d Cir. 1996). In order for a party to meet the first prong of this standard, the "potential injury . . . justify[ing] the granting of injunctive relief . . . must be irreparable; that is, it must be the kind of injury for which an award of money cannot

compensate." <u>Sperry Int'l Trade, Inc. v. Government of Israel</u>, 670 F.2d 8, 12 (2d Cir. 1982).

"Thus, if it appears that the potential harm to the [requesting] party is simply a monetary loss, the

potential injury is normally not deemed irreparable[,] and hence does not justify injunctive relief."

<u>Id.</u>; <u>see also</u> <u>Reuters Ltd. v. United Press Int'l, Inc.</u>, 903 F.2d 904, 907 (2d Cir. 1990) (irreparable

injury "must be one incapable of being fully remedied by monetary damages"). <u>Old Republic Ins.

Co.</u>, *supra*, 170 F.R.D. at 365.

**The First Amendment**

The First Amendment states in part that "Congress shall make no law . . . abridging the

freedom of speech." <u>U.S. Const. Amend. I</u>. Courts have tangled with this deceptively simple

phrase from the inception of the Republic.

The Supreme Court has held that political speech (the type of speech in which plaintiff

engages when he posts his signs) is entitled to the highest form of protection afforded by the First

Amendment. <u>McIntyre v. Ohio Elections Commission</u>, 514 U.S. 334, 346, 115 S. Ct. 1511, 131 L.

Ed. 2d 426 (1995); <u>Mills v. Alabama</u>, 384 U.S. 214, 218, 86 S. Ct. 1434, 16 L. Ed. 2d 484 (1966).

Moreover, a statute regulating speech "of private citizens on private property or in a traditional

public forum is presumptively impermissible, and this presumption is a very strong one." <u>City of

Ladue v. Gilleo</u>, 512 U.S. 43, 59, 114 S. Ct. 2038, 129 L. Ed. 2d 36 (1994) (O'Connor, J.,

concurring). The Supreme Court has also held that the First Amendment's protections encompass

not only actual speech but an individual's expressive conduct (such as the posting of signs) as

well. <u>See</u> <u>Virginia v. Black</u>, 538 U.S. 343, 358, 123 S. Ct. 1536, 155 L. Ed. 2d 535 (2003)

(citations omitted).

The level of scrutiny that a court gives to statutes restricting speech depends on whether or

not the regulation is content based. Where a court determines that a law restricts speech on the basis of its content – that is, when the content of the speech determines whether the ordinance applies or not, <u>Metromedia, Inc. v. City of San Diego</u>, 453 U.S. 490, 516, 101 S. Ct. 2882, 69 L. Ed. 2d 800 (1981) – the regulation is presumptively invalid, <u>R.A.V. v. City of St. Paul, Minn.</u>, 505 U.S. 377, 382, 112 S. Ct. 2538, 120 L. Ed. 2d 305 (1992), and must be strictly scrutinized. The regulation will only be upheld against a constitutional challenge if the municipality shows that it ". . . is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." <u>Boos v. Barry</u>, 485 U.S. 312, 321, 108 S. Ct. 1157, 99 L. Ed. 2d 333 (1988).

Content neutral laws regulate matters unrelated to speech and only incidentally affect First Amendment rights. <u>Turner Broadcasting Systems, Inc. v. FCC</u>, 512 U.S. 622, 643, 114 S. Ct. 2445, 129 L. Ed. 2d 497 (1994) (hereinafter, "<u>Turner I</u>"). Intermediate scrutiny is applied to such laws. To survive such scrutiny, the regulation must "further an important or substantial governmental interest unrelated to the suppression of free speech, provided the incidental restrictions [do] not 'burden substantially more speech than is necessary to further those interests." <u>Turner Broadcasting Systems, Inc. v. FCC</u>, 520 U.S. 180, 186, 117 S. Ct. 1174, 137 L. Ed. 2d 369 (1997) (hereinafter, "<u>Turner II</u>") (citation omitted).

> When making this determination, the threshold inquiry in speech
> cases is whether the government has adopted a regulation of
> speech because of disagreement with the message it conveys . . .
> The government's purpose is the controlling consideration . . .
> Government regulation of expressive activity is content neutral so
> long as it is "justified without reference to the content of the
> regulated speech."

<u>Board of Managers of Soho Intern. Arts Condominium</u>, No. 01 Civ. 1226, 2004 WL 1982520, at *10 (S.D.N.Y Sept. 8, 2004) (quoting <u>Clark v. Community for Creative Non-Violence</u>, 468 U.S.

288, 104 S. Ct. 3065, 82 L. Ed. 2d 221 (1984) (citations omitted).

First Amendment protections, while broad, are not absolute. See Regan v. Boogertman, 984 F.2d 577, 579 (2d Cir. 1993) (citing Elrod v. Burns, 427 U.S. 347, 360, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976)). The Government may impose reasonable time, place and manner restrictions on speech as long as they are content neutral, narrowly tailored to serve a significant government interest and leave open "ample channels for communication." Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S. Ct. 2746, 105 L. Ed. 2d 661 (1989).

Plaintiff alleges that Chapters 64, 104, and 134 of the Village of Cold Spring Code violate the First Amendment.

The Village challenges neither plaintiff's standing nor the ripeness of his facial challenge to these ordinances, and properly so. As my colleague Judge Conner has noted in a case similarly challenging a local "sign" ordinance, "Traditional requirements of standing are relaxed when the matter involves a prior restraint of speech or expression because of the potential for abuse of First Amendment rights." Knoeffler v. Town of Mamakating, 87 F. Supp. 2d 322, 332 (S.D.N.Y. 2000). Where, as here, a plaintiff claims that a statute on its face impinges on the right of free speech, the Supreme Court has allowed plaintiffs to sue as long as the plaintiff demonstrates "a substantial risk that application of the provision will lead to the suppression of speech." Lerman v. Board of Elections in the City of New York, 232 F. 3d 125, 144 (2d Cir. 2000). Additionally, "when a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially without the necessity of first applying for, and being denied, a license." City of Lakewood v. Plain Dealer Pub. Co., 486 U.S. 750, 755-56, 108 S. Ct. 2138, 100 L. Ed. 2d 771 (1988).

Finally, this case is not moot, because the Village could not establish that it is

". . . absolutely clear that the allegedly wrongful behavior could not reasonably be expected to

occur." Gwaltney of Smithfield, Lt. V. Chesapeake Bay Found., Inc., 484 U.S. 49, 66, 108 S. Ct.

376, 98 L. Ed. 2d 306 (1987). Second, plaintiff has asserted a proper claim for nominal damages

under 42 U.S.C. § 1983 for the prior alleged violation. Van Wie v. Pataki, 267 F.3d 109, 115 (2d

Cir. 2001) ("We note that had the plaintiffs sought money damages in addition to their request for

injunctive relief, this controversy would not be moot. Indeed, for suits alleging constitutional

violations under 42 U.S.C. § 1983, it is enough that the parties merely request nominal

damages.")

One of the challenged sections of the Ordinance, Chapter 134, deals specifically with

signs posted on private property throughout the Village. Chapter 64 contains specific regulations

pertaining exclusively to Cold Spring's Historic District, where plaintiff lives. The third

challenged chapter, 104, deals with the posting of signs in traditional public fora, such as on

telephone poles. I will deal with the last challenged section first, because the Village agrees that

the law does not pass constitutional muster.

**Chapter 104**

Chapter 104 of the Code, entitled "Signs and Placards," governs the posting of handbills,

placards, and signs on utility poles, public streets, and sidewalks. Chapter 104 requires anyone

who wishes to post signs in these traditional public fora to obtain a permit from the Mayor.

Defendants concede that Chapter 104 is unconstitutional, because the law is not content neutral.

(See Defendant's Supplemental Memorandum of Law in Opposition to Plaintiff's Claim for an

Injunction and in Support of a Dismissal, dated February 15, 2005, at 17 ("Defendant Supp

Memo")); <u>Metromedia Inc.</u>, *supra*; <u>Knoeffler</u>, *supra*. Additionally, Chapter 104 contains no standards or guidelines for the mayor to follow when determining whether or not to grant permits. The Supreme Court has held that, "The First Amendment prohibits the vesting of such unbridled discretion in a government official." <u>Forsyth County v. Nationalist Movement</u>, 505 U.S. 123, 132, 112 S. Ct. 2395, 120 L. Ed. 2d 101 (1992).

The Village of Cold Spring is in the process of redrafting Chapter 104. (<u>See</u> Defendant's Memo, at 17.) Nonetheless, plaintiff is entitled to an injunction against enforcement of the existing law. The voluntary repeal of an ordinance "does not necessarily moot challenges to it, because without a judicial determination of constitutionality the particular governing body remains free to reinstitute the law at a later date." <u>National Advertising Co.v. Town of Babylon</u>, 900 F. 2d 551, 554, n.2 (2d Cir. 1990). There is no indication in the record before me that the admittedly unconstitutional ordinance has in fact been repealed, and even if it had, this court could enter an injunction pursuant to the rule of <u>National Advertising</u>. I therefore grant plaintiff's motion for summary judgment declaring Chapter 104 unconstitutional and enjoining its enforcement.

**Chapter 134**

Chapter 134 of the Code, entitled "Zoning,"contains regulations that deal with, *inter alia*, the posting of signs on private property generally. As noted above, plaintiff was cited for violating certain provisions of Chapter 134, specifically § 134-9B and § 134-9G(1-b). Plaintiff attacks the constitutionality of those sections of Chapter 134 and several others.

*Section 134-2.*

The foundational constitutional challenge to Cold Spring's sign ordinance is plaintiff's

challenge to the definition of the word "sign." According to § 134-2, a "sign" is "Any device for visual communication that is used for the purpose of bringing the subject thereof to the attention of the public, but not including any flag, badge or insignia of any governmental agency or any civic, charitable, religious, patriotic, fraternal or similar organization."

Section 134-9 restricts the ways in which residents of Cold Spring's General Business District may use their property. According to § 134-2 of the statute, a "use" is "the specific purpose for which land or a building is designed, arranged, intended or for which it is or may be occupied or maintained." Included under "Uses permitted" are "signs subject to regulations hereafter set forth in subsection G and § 134-18A." These subsections regulate, *inter alia*, the size and placement of the signs. Because signs are property uses regulated by the Village, Plaintiff contends that the non-content neutral statutory definition of "sign" renders Chapter 134 unconstitutional. Specifically, plaintiff really challenges as unconstitutional the fact that his political signs are subject to the permitting and other requirements of §§ 134-9(B), 134-9(G)(1) and 134-18 of the Code, while the "flag, badge or insignia of any governmental agency or any civic, charitable religious, patriotic, fraternal or similar organization" are not subject to those requirements, because they are excluded from the definition of the word "sign." Each of these sections imposes some burden on a person who wishes to post a "sign" (as defined by the Code) that is not similarly imposed on a person who wishes to post a dvice that falls within the "flag, badge or insignia" exemption.

§ 134-9 contains the general zoning regulations for the B-1 General Business District. Section 134-9(B) provides:

**B. Site plan review and approval.** In each case where a building or use is proposed in this district, a site plan shall be submitted to the Building Inspector, who shall refer the site plan of the proposed building to the Planning Board for its review. Such Board shall . . . approve, approve with modifications or disapprove said site plan. In modifying or disapproving any site plan, the Board shall enter its reasons for such action in its records. . . .

Section 134-9G(1), **Supplementary regulations applying to the B-1, General Business District**, provides:

1. Signs are permitted accessory to an establishment located on the same lot, provided such signs shall be limited . . . as follows:

a. Where the building is set back from the front lot line less than twenty-five (25') feet, not more than one (1) such sign shall be permitted for each tenant on the premises on each wall fronting on a street or public parking lot.

b. The aggregate area in square feet of all signs on any wall shall not be greater than thirty-two (32) sq. ft.

c. Such sign or signs shall be parallel to the face of the building . . .

Finally, § 134-18 contains a number of additional regulations that are applicable to all "signs:"

**A. Supplementary sign regulations.**

(1) No signs, billboards, advertising display, structure or device shall be erected, moved, enlarged or reconstructed except as expressly permitted in this chapter.

(2) The following types of signs or artificial lighting are prohibited:

(a) Billboards, i.e., any sign advertising a product or services not legally being sold or rendered on the premises where sign is located.

(b) Flashing signs. . . .

(c) Signs which project more than one (1') foot over a street or walk.

(d) Signs which compete for attention with or may be mistaken for a traffic signal.

(e) The outlining by direct illumination of all or any part of a building, such as a gable, roof, side, wall or corner, except for holiday lighting.

(f) Signs made of cardboard, paper, canvas or similar impermanent material, with the exception of automotive service stations, where seasonal point-of-sale material may be displayed at gasoline pump islands for a period no longer than thirty (30) days.

The issue before this Court is whether exempting "flags, badges or insignia of any governmental agency or any civic, charitable, religious, patriotic, fraternal or similar organization" from the permitting and other sign requirements makes Chaptet 134 a content based regulation, subject to strict scrutiny. It does.

As the Supreme Court has noted, "With respect to non-commercial speech, the city may not choose the appropriate subjects for public discourse." Metromedia Inc., *supra*, 453 U.S. at 515 (quoting Consolidated Edison Co. v. Public Service Comm'n, 447 U.S. 530, 538, 100 S. Ct. 2326, 65 L. Ed. 2d 319 (1980)). Of course, a "flag, badge or insignia" is nothing more than an identifying symbol, typified by the familiar lion's head (Lion's Club) or the gold badge of the American Legion. The messages such insignia convey is nothing more than a message of identification with the particular organization. Only the non-commercial nature of the organization identified differentiates this from a sign saying "Frank's Garage" or "IGA Supermarket."

However, the display of identifying symbols by non-commercial organizations

constitutes expressive speech, because public identification with the group carries a message.

See generally West Virginia State Bd. of Educ. v. Barnette, 319 U.S. 624, 632, 63 S. Ct. 1178, 87 L. Ed. 1628 (1943) ("Symbolism is a primitive but effective way of communicating ideas. The use of an emblem or flag to symbolize some system, idea, institution, or personality is a short cut from mind to mind."). By permitting the posting of flags, badges or insignias associated with governmental agencies and charitable organizations, the Village has discriminated between those who might wish to demonstrate their affiliation with and support of such organizations and those who might wish to demonstrate their affiliation with and support of, say, sports teams (a Yankees flag) or a commercial enterprise (a local theatrical troupe), or a work-related organization (labor union) or a political affiliation (the Republican Party). Persons affiliated with or approving of the former can hang their banners and badges without going through the permitting process, while persons who wish to display banners and badges of others groups cannot.

Therefore, the ordinance is not content neutral (i.e., the content of the speech determines whether or not the ordinance applies). I must apply strict scrutiny and determine whether the restrictions the ordinance imposes are the narrowest means of furthering a compelling governmental interest.

The first step in such analysis is to identify the compelling governmental interest that is purportedly effected by Chapter 134. The Code indicates that the purposes of Chapter 134 include, *inter alia*:

> C. To recognize that the traffic capacity of the village streets is limited and that proper control of parking and traffic is of paramount importance for adequate transportation and safety from fire and public dangers.

12

> D. To recognize that the Village of Cold Spring is situated in a
> location of unique beauty and that all planning and zoning must
> have as one of its goals the development of a village that will blend
> and harmonize with the surrounding countryside, thereby making a
> more pleasant, relaxed and healthful community for all.

(See § 134-1.) In its Supplemental Memorandum, Defendant characterizes these purposes as an

"interest in maintaining orderly development" of the business district. (Defendant's Supp.

Memo, at 15.)

The Village argues that its interest in promoting aesthetics and traffic safety justify its

restriction on graphic communication. Courts have upheld content neutral regulations of signs

based on similar government interests. Kovacs v. Cooper, 336 U.S. 77, 86-87, 69 S. Ct. 448, 93

L. Ed. 513 (1949) (stating that the rights of free speech do not compel municipalities to allow

sound trucks with broadcasts of public interest because the distractions would be dangerous to

traffic and would disturb the peace and tranquility of residential thoroughfares); Nichols Media

Group, LLC v. Town of Babylon, 365 F. Supp. 2d 295, 307-9 (E.D.N.Y. 2005) (holding that an

ordinance that directly advances the goals of avoiding driver distraction and improving a town's

aesthetics directly advanced a substantial government interest). However, the Cold Spring

ordinance is not content neutral, and for that very reason cannot possibly be the narrowest means

to effect that compelling governmental interest. Aesthetics can be just as compromised, and

motorists can be just as distracted, by displays of governmental, religious or charitable flags,

badges and insignia as by displays of other types of flags, badges or insignia. Dimmitt v.

Clearwater, 985 F. 2d 1565 (11th Cir. 1993); National Advertising Co. v. City of Orange, 861 F.

2d 246, 248-9 (9th Cir. 1988). Thus, the content based restriction inherent in the sign ordinance's

definition of the term "sign" does not serve the state interest that is supposedly vindicated by the sign ordinance itself.

In sum, because Chapter 134 defines the word "sign" as it does, the regulations on the posting of "signs" set forth in that Chapter are unconstitutional, and plaintiff is entitled to an injunction against the enforcement of Chapter 134 in its entirety.[1]

Because Chapter 134 as written cannot constitutionally be enforced, it is not necessary for me to reach plaintiff's alternative challenge to the Chapter, which is that the regulations give the Review Board unfettered discretion to decide which signs to approve and which not to approve.

**Chapter 64**

Chapter 64 of the Code, entitled "Historic District," concerns the preservation of the historic area of Cold Spring. The boundaries of Historic District are defined in § 64-3 and the map attached thereto. Plaintiff's property, located at 13 Main Street, lies within the boundaries of the Historic District.

Section 64-1, "Purpose and Public Policy," states that, "[P]reservation of Cold Spring's architectural character will promote pride in the heritage of the community and result in the direct economic benefit to Cold Spring by universally preserving its distinctive character." (See Code § 64-1(A).) The stated public policy of this Chapter is the "enhancement, perpetuation, preservation, and use of improvements of historic, aesthetic, and architectural value is a public

---

[1] The Village made a general request for severance in its papers. (Defendant's Supp. Memo, at 19-20.) Within Chapter 134, however, it is not possible to sever any unconstitutional regulations from the constitutional ones, because every regulation in the Chapter applies to "signs," and the constitutional infirmity of the regulations derives from the discriminatory definition of the word "sign."

necessity and is required in the interest of health, prosperity, safety and the welfare of the people of the Village of Cold Spring."

To this end, § 64-5 makes it unlawful to permit or maintain any "alteration" to any "improvement" without first obtaining a license from the Review Board (i.e., a Certificate of Appropriateness ("COA")). Buildings are improvements, and an outdoor sign (at least one attached to a building) would qualify as an "alteration" to a building if it resulted in "a change in the architectural appearance of the property." § 64-2(A)(3).[2] Outdoor signs also qualify as "improvements" by virtue of § 64-2(B), which means (I assume) that existing signs could not be altered without obtaining a Certificate of Appropriateness.[3]

Section 64-7 states the basis upon which the Review Board determines whether or not to grant a Certificate of Appropriateness. For example, an alteration or improvement must retain historic architectural features (as viewed from the street) (see § 64-7A(1)), and the sign must be compatible with historical character and with the exterior features of neighboring properties. See § 64-7A(2). In determining compatibility, the Review Board is authorized to consider a number of

---

[2] I question whether a sign that was simply placed on the ground in front of a house, as opposed to being "affixed" (attached) to a building, would meet the literal definition of "alteration" to an "improvement" within the meaning of the Code. If I am right about this, then plaintiff's placement of a sign on the ground leaning against his front porch might well violate only of Chapter 134 and not Chapter 64. Of course, plaintiff was cited for violating § 64-2(A)(3) twice – once for the sign on his porch, and once (presumably) for the sign propped up against his porch. It is possible that the Building Inspector of Cold Spring does not subscribe to my interpretation. One cannot be sure of this, however, since Plaintiff was not found guilty of violating Chapter 64.

[3] "Improvement" is defined in the Chapter as "any building or fixture located within the District or subject to the provisions of this chapter, including but not limited to houses, stores, warehouses, churches, schools, barns, fences, outhouses, pumps, gravestones, light fixtures, outdoor signs, and other outdoor advertising fixtures." (See Code § 64-2(B).)

factors: (a) general design, appropriateness to property; (b) scale of proposal relative to property; (c) texture and materials in relation to property; (d) visual compatibility with surrounding properties; and (e) importance of architectural features to historic significance of property. Section 64-7C further provides that, in applying the standards to improvements, the Review Board should follow the Secretary of the Interior's Standards for Rehabilitation and Guidelines for Rehabilitating Historic Properties.

Pursuant to § 64-7D, the Review Board is empowered to hold a public hearing on an application, is required to render a decision on the application within 15 days of such a hearing. Any hearing must be scheduled within 30 days after the first monthly meeting of the Review Board following submission of the application. In the event that the Review Board wishes to extend the time in which to render a decision on a license application, it must obtain written consent from the applicant. See Code § 64-10.

Finally, § 64-11(C) allows the Review Board to "prescribe conditions under which the alteration or demolition of any structure within the District may be done in order to effectuate the purpose of this chapter, and any determination may include the recommendations of the Review Board."

Plaintiff claims that Chapter 64 operates as a prior restraint because speakers need permission from the Historic Chapter Review Board before posting signs in the Historic District. He further alleges that Chapter 64 is unconstitutional because the Review Board has unfettered decision making power and lacks any guidelines or standards.

To deal with plaintiff's first contention, I must decide whether the restrictions Chapter 64 puts in place are content based or content neutral. See City of L.A. v. Alameda Books, 535 U.S.

425, 434, 122 S. Ct. 1728, 152 L. Ed. 2d 670 (1992). The answer is: content neutral. Chapter 64

does not distinguish among various types of improvements, or various types of signs.  Before an

individual living or working in the Historic District can make *any* alteration to the improvements

on his property, he must first obtain a COA. Nothing in the Historic District is exempt from

Chapter 64 review, and nothing in Chapter 64 authorizes the Board to make its decisions based on

the content of the alteration. Although plaintiff contends that the ordinance differentiates between

commercial and non-commercial signs (based on a note scribbled on his violation notice), there is

no mention anywhere in Chapter 64 of such a distinction. The Chapter applies to all types of

alterations and improvements – and hence, to all types of signs. Courts have held that when

regulations apply to all types of signs, regardless of content, they are constitutional. See

Sugarman v. Village of Chester, 192 F. Supp. 2d 282, 293 (S.D.N.Y. 2002).

     Plaintiff's allegations regarding the content-neutrality of Chapter 64 are very similar to the

plaintiff's allegation in Board of Managers of Soho, *supra*, 2004 WL 1982520. There, the

plaintiff also alleged that a review board's procedures for allowing alterations to a landmark

district in New York City were content based. The factors outlined for deciding whether to allow

alterations were strikingly similar to the factors listed in the Cold Spring Village Code.[4] The

Court in Board of Managers of Soho found that the review board's procedures were, in fact,

content neutral. Id., at *10. Judge Batts wrote, "The Commission's written determinations do not

---

     [4] The review board was to look at the affect on the exterior architectural features, the
relationship between the results of the proposed work and the exterior and how the proposed
work would affect the historical nature of the structure.  See Board of Managers of Soho, *supra*,
2004 WL 1982520, at *8.

express approval of, nor even refer to, the Work's content, and Plaintiff does not cite anything in the record to corroborate this assertion." Id.

Of course, Chapter 64 would not be content neutral, as least insofar as "signs" go, if it imported the decidedly non-content neutral definition of that terms from Chapter 134. But it does not. Chapter 134's definition of the term "sign" is "for purposes of this chapter" only.  Since I have concluded that Chapter 134 cannot be enforced, the constitutionality of Chapter 64 insofar as it reaches signs like plaintiff's rests solely on the language of that ordinance. And the language of Chapter 64 is completely content neutral.

Because I conclude that Chapter 64's regulations are content neutral, I apply intermediate scrutiny. As noted above, for Chapter 64 to survive, it must serve to further an important governmental interest and any incidental restrictions that arise because of it may not burden speech more than is necessary. See Turner II, supra, 520 U.S. at 217-18.

The claimed purpose of the provisions in Chapter 64 is to maintain the architectural character of the Historic District, to promote community pride and affect economic growth. "The Supreme Court has held that aesthetics are a substantial governmental interest well within the police power of the state to regulate." Board of Managers of Soho, supra, 2004 WL 1982520, at *14 (citing Members of City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 805, 104 S. Ct. 2118, 80 L. Ed. 2d 772 (1984) (holding that "it is well settled that the state may legitimately exercise its police powers to advance [a]esthetic values")). Attempts to enhance the aesthetic appeal and monetary value of property, as well as foster a healthy community spirit, are valid and important state interests. The Village of Cold Spring was within its power to attempt to do so through its ordinances.

The only question is whether the regulations are more burdensome than necessary to achieve the Village's laudable goal of keeping the Historic District "historic" looking. "The Court must additionally ensure that the regulation adopted restricts speech 'no greater than is essential to the furtherance of that interest.'" Board of Managers of Soho, *supra*, 2004 WL 1982520, at *15 (quoting United States v. O'Brien, 391 U.S. 367, 377, 88 S. Ct. 1673, 20 L. Ed. 2d 672 (1968)). Courts will find that a regulation meets this criteria, "so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation . . . [and that] the means chosen do not burden substantially more speech than is necessary to further the government's legitimate interests." Turner I, *supra*, 512 U.S. at 662. The Supreme Court has also stated, "So long as the means chosen are not substantially broader than necessary to achieve the government's interest, . . . the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." Turner II, *supra*, 520 U.S. at 217-18 (quoting Ward, *supra*, 491 U.S. at 800).

On the (rather meager) record before this Court, it appears that the Board's review of proposed alterations to improvements in the Historic District furthers the important governmental interest of maintaining the architectural character of the neighborhood. Without this type of review process, residents would be free to remodel or tear down their historic homes, or erect two hundred-foot signs that would completely block the historic structures of the District from view. It is possible to imagine that, without these regulations, the historic character of the District could be entirely wiped away.[5]

---

[5] The Court has visited Downtown Cold Spring on a number of occasions, though not in connection with the instant matter. It is quaint and charming.

Chapter 64 also does not burden substantially more speech than necessary. Simply because residents must go before the Board to obtain permission before making alterations does not mean alterations will not be approved. And to the extent that permission is denied, residents have numerous alternative channels of communication in other areas of the Village, including the traditional public fora that were the subject of Chapter 104. Indeed, if I am reading the literal text of Chapter 64 correctly, plaintiff and other residents of the Historic District may even be free to post signs on their property (as long as they did not "affix" the signs to their "improvements"). See Ward, *supra*, 491 U.S. at 800 (holding that regulations restricting speech must leave open ample channels of communication).

Because I am applying intermediate scrutiny, it is not for this Court to decide whether Chapter 64 constitutes the most efficient and effective form of regulation. See Turner II, *supra*, 520 U.S. at 218 (noting "[i]t is well established a regulation's validity 'does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests.'" (quoting United States v. Albertini, 472 U.S. 675, 689, 105 S. Ct. 2897, 86 L. Ed. 2d 536 (1985)).

Plaintiff's alternative challenge to Chapter 64 is his claim that the Review Board has unfettered discretion to decide which alterations and improvements to approve and which to deny

In City of Lakewood v. Plain Dealer Pub. Co., the Supreme Court held that, "Even if the government may constitutionally impose content-neutral prohibitions on a particular manner of speech, it may not *condition* that speech on obtaining a license or permit from a government official in that official's boundless discretion." 486 U.S. 750, 755-56, 108 S. Ct. 2138, 100 L. Ed. 2d 771 (1988) (emphasis in original). Licensing schemes that grant government officials

unbridled discretion raise two First Amendment concerns: (1) self-censorship (to avoid denial of a license to speak), and (2) the difficulty of reviewing potentially content based censorship without standards by which to measure the licensor's actions. Id. at 759.

A law that subjects the exercise of First Amendment freedoms to the prior restraint of a licensing requirement "must contain narrow, objective, and definite standards to guide the licensing authority." Sugarman, *supra*, 192 F. Supp. 2d at 295 (citing Forsyth, *supra*, 505 U.S. at 130-31). Such a permit system must "leave no factors to be assessed, judgments to be made, or discretion to be exercised by the appropriate licensing official." Paulsen v. Lehman, 839 F. Supp. 147, 164 (E.D.N.Y. 1993) (citing Hynes v. Mayor of Oradell, 425 U.S. 610, 96 S. Ct. 1755, 48 L. Ed. 2d 243 (1976)). Plaintiff contends that no such constraints are enforced on the Review Board here.

As noted above, Section 64-7 contains the factors that the Review Board is to apply in deciding whether to grant COAs for Historic District alterations. The Section sets forth two general standards: (1) retaining the exterior architectural features that contribute to the historic character of the improvement as seen from the street, and (2) maintaining compatibility with the exterior features of neighboring properties. See Code § 64-7(1)-(2). With regard to compatibility, the Code sets forth five factors to be considered by the Review Board:

> (a) The general design, character and appropriateness to the property of the proposed alternation or new construction;
>
> (b) The scale of proposed alteration or new construction in relation to the property itself, surrounding properties, and the neighborhood;
>
> (c) Texture and materials, and their relation to similar features of the properties in the neighborhood;

(d) Visual compatibility with surrounding properties, including proportion of the property's front façade and roof shape; and

(e) The importance of architectural or other features to the historic significance of the property.

See Code § 64-7(2)(a)-(e). Finally, the Code indicates that the Board should use the Secretary of the Interior's Standards for Rehabilitation and Guidelines for Rehabilitating Historic Properties as a guide when making its considerations.

Notably, the content of a sign, should the alteration be a sign, is not among the factors to be considered by the Board.

Of course, determining historic accuracy is an inherently subjective enterprise. However, the Review Board is constrained by a variety of factors that it must consider, as well as by federally-promulgated standards and guidelines. These codified constraints on Board conduct require the Board to make and justify its decisions in conformity with a variety of factors, none of which touches on the content of any message to be imparted by the alteration or improvement. Since consideration of content would be constitutionally impermissible, the fact that the ordinance does not contain a specific prohibition against content consideration does not militate against a finding of constitutionality. I conclude that Chapter 64 does not confer unfettered discretion on the Review Board – far from it – and that plaintiff's challenge to the Chapter on this ground fails as well.

**Defendant's Request for Severance**

Defendant asks, should this Court find any of the three challenged chapters unconstitutional, that I sever the unconstitutional provisions and leave the others intact. Because Chapters 134 and 64 operate independently of one another (as explained above), there is no need

Chapters 134 and 64 operate independently of one another (as explained above), there is no need to worry about severance – the Village can and will be enjoined from enforcing Chapter 134 while it may continue to enforce Chapter 64 as to signs (to the extent they qualify as "alternations" or "improvements") in the Historic District.

**Conclusion**

The Village of Cold Spring is enjoined from enforcing Chapters 104 and 134 of the Village Code. Plaintiff's counsel is directed to propose an appropriate form of final judgment reflecting the above rulings with the Court within ten (10) days of the date of this decision.

This constitutes the decision and order of the Court.

Dated: August 19, 2005

_____
U.S.D.J.

BY FAX TO:
James A. Randazzo, Esq.
Stephen Bergstein, Esq.